UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROY GRAY,

                                  Petitioner,

          – against –

HAROLD GRAHAM, *Superintendent,
Auburn Correctional Facility*,

                                  Respondent.

**OPINION & ORDER**

17 Civ. 2809 (ER) (OTW)

RAMOS, D.J.:

        Roy Gray brings this *habeas corpus* proceeding pursuant to 28 U.S.C. § 2254,

seeking to challenge his 2008 conviction for murder in the second degree.  Doc. 12 ¶¶ 2,

4 (Amended Petition, hereinafter "Am. Pet.").  Gray was sentenced to twenty-five years

to life imprisonment.  Am. Pet. ¶ 3.  In the instant petition, Gray argues that he was

denied his constitutional right to the effective assistance of counsel, and that such denial

in State Court was contrary to, or involved an unreasonable interpretation of, clearly

established federal law.  Doc. 13 at 7.  For the reasons set forth below, the Court adopts

the Report and Recommendation ("R&R") of Magistrate Judge Ona T. Wang, and denies

the Petition.

I.    **BACKGROUND**

      **A.  The Underlying Incident and Interrogation**

      *1.  The Murder and Arrests*

        On Tuesday, November 16, 2004, at approximately 10:00 p.m., two men, one

armed, entered the apartment where Marilyn Samuels lived in the Bronx with her two

sons, thirteen-year-old K.S. and nineteen-year-old Levi Bernard.  T. 44–47, 51–52, 59.[1]

---

[1] Citations to the State Court Transcript are preceded by "H." for pretrial hearings (docketed at Doc. 25,
ECF 1–54), "T." for trial (docketed at Doc. 25 at ECF 55–112; Doc. 25-1–Doc. 25-7 at ECF 18), and "S."
for the sentencing hearing (docketed at Doc. 25-7 at ECF 18–28).  The page numbers indicated by the
citations refer to the page numbers reflected on the transcript pages.  For example, "H. 166" refers to the
transcript page marked with "166," which is docketed at Doc. 25 at ECF 32.

Ms. Samuels heard the sound of glass shattering and left her bedroom to find the two men and Levi, who was backing into K.S.'s bedroom.  T. 51–52.  The armed man told Ms. Samuels to "back the fuck up, bitch" and "started shooting."  T. 52.  After retreating behind her door, Ms. Samuels called 911 and heard three shots.  T. 52.  K.S. had also seen Levi backing into his bedroom and fled by jumping out of a window.  T. 95.  Levi was shot twice, and he was taken by an ambulance to Jacobi Hospital, where he was pronounced dead on arrival.  T. 31, 380, 415.

Approximately six months later, on April 27, 2005, Gray and his half-brother, Terry Bazemore, were identified as having been involved in shooting Levi to Detective Michael DePaolis of the New York City Police Department ("NYPD") by a woman named Latisha Lindsay, who went by the nickname "Lovely."  H. 148, 149; T. 228–230. Earlier on the day of the incident, K.S. had seen a woman matching Lindsay's description yelling outside of their home; that same day, K.S. also heard a woman with a voice matching Lindsay's call the family's phone repeatedly.  T. 90–93, 98, 108–9.  Ms. Samuels also had a conversation on the phone with a woman named either "Lekisha" or "Latisha," who alleged she had had sex with Levi.  T. 119.  The caller told Ms. Samuels she "should teach [her] son the meaning of the word no."  *Id.*

Bazemore was arrested on April 28, 2005 at an address obtained from Lindsay.  T. 229–30, 331–33.  Lindsay also told DePaolis that Gray was in Wilson, North Carolina.  T. 239.  Gray was subsequently taken into custody by the Wilson Police Department on May 1, 2005.  T. 240–42, 359.  Detective DePaolis, along with Detective James Conneely, arrived at the Wilson Police Department at 6:00 p.m. the next day.  T. 242–3.  At 7:00 p.m. Gray was transported to the police department from the county jail.  T. 243.

2.  *The Interrogation and Written Statement*

a.  *Interrogation*

DePaolis first met Gray at approximately 7 p.m.  T. 243.  He introduced himself and Detective Conneely, then he orally gave Gray *Miranda* warnings.[2]  *Id.*  At that point, they began to discuss the "incident surrounding this case."  T. 244.  The conversation lasted "a little over an hour."  T. 245.

In the first ten minutes of the conversation, Gray "put his hands on his chest" and told DePaolis that he was going to take the blame for the murder because his brother had "served enough time."  *Id.*  Then, Gray went "into the full story," telling the detectives how he had gone to Levi's house and shot him.  *Id.*  Nothing in the record suggests that Gray was interrogated further after this point.

At approximately 8:25 p.m., DePaolis said he wanted to put Gray's statement in writing, and Gray agreed to do so.  T. 252.  At that point, DePaolis administered Gray the *Miranda* warnings a second time, this time reading them from a Wilson police department form ("North Carolina form").  *Id.*  Gray indicated that he understood those warnings, by writing "yes" and his initials after each question on the form.  H. 168–69.  DePaolis did not, however, take the written statement immediately after reading Gray those rights, because DePaolis was "attempting to get the NYPD form to take the statement which also included the *Miranda* warnings."  H. 169.

About 45 minutes later, just prior to 9:10 p.m., DePaolis received a fax containing the NYPD "statement/*Miranda* form."  H. 170.  DePaolis administered Gray the *Miranda* warnings a third time, using this NYPD form.  Gray indicated that he understood those rights by writing "yes" and his initials after each question on the form.  H. 170–71.

---

[2] Pursuant to *Miranda v. Arizona*, "[p]rior to any questioning, [a] person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  384 U.S. 436, 444 (1966).  Moreover, "[i]n order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him."  *Id.* at 473.

At 9:30, DePaolis began writing the statement, and once completed, the written statement was signed by Gray, DePaolis, and Detective Conneely.  T. 253; H. 172–73.

### b.  Gray's Written Statement

Gray's written statement in its entirety states:

> On 11/16/04 at about 8 pm Darren told me that something happened to Lovely.  Darren, my brother [Bazemore], myself and 2 other Male/Blacks, who I don't know there [sic] names, got into a Livery Cab and went to Lovely's house on E224 St.  When we got there, Lovely was crying and said that a guy raped her.  She showed us where he lived, and we all walked to his house.  Lovely and Darren walked up to the front the door and rang the bell.  A male came to the door and Lovely yelled "That's him."  She also said to him "you're going to get yours."  Then the door opened and Darren and Lovely walked in and I heard a shot.  Then [Bazemore], myself and the 2 other males walked into the house and we all went to the bedroom.  Lovely was yelling at the male that "now you're going to get yours."  I then hit the male in the face with my hand twice and he grabbed my gun, which Darren had passed me in the living room.  My gun is a .38 cal revolver.  I managed to pull away and I pointed the gun at the males [sic] testicles and Lovely said "Get him."  I then fired one shot from my gun at the male's testicles.  I then ran out of the house and made a left out of the yard down a side street, and threw my gun into a bush.  I then walked back to Hammersly Ave. and was confronted by two police officers in plain clothes who asked me if I heard shots.  I told them know [sic] and they left.  I walked a few blocks and caught up to Lovely and we got into a Cab and went back to the Grand Concourse.  The next day at about 10:00 AM I took a cab back to Hammersly Ave and walked down the dead end street and picked up my gun from the bush I threw it in the night before.  The next day I gave the gun to a male that I know from the block but don't know his name.  Det. DePaolis showed me a photo of Lovely, a photo of Darren and a photo of [Bazemore].

Doc. 26-2.

## B.  Indictment and Motion to Suppress Proceedings

### 1.  Indictment

Gray was extradited to New York, T. 175, and on May 6, 2005, four days after the interrogation in North Carolina, he was indicted by a Grand Jury in Bronx County for murder in the first degree, P.L. § 125.27(1)(a)(7), acting in concert with other individuals for murder in the second degree, P.L. § 125.25(3), burglary in the first degree, P.L. §§

140.30(2),(4), conspiracy in the second degree, P.L. § 105.15, and conspiracy in the fourth degree, P.L. § 105.10(1).  Doc. 26-1.

### 2.  Motion to Suppress and Hearing

Gray, through his then-counsel Roy J. Schwartz, Esq., moved pretrial to suppress his written statement.  Doc. 26-3.  On September 30, 2005, Justice Troy K. Webber ordered a suppression hearing pursuant to *People v. Huntley*, 15 N.Y.2d 72 (1965) and *Dunaway v. New York*, 442 U.S. 200 (1979).  Doc. 26-5.

On November 27 and 29, and December 6, 2006, Justice Seth Marvin held suppression hearings for both Gray and Bazemore.  Doc. 26-6 at 2.  Gray was represented at the suppression hearing by Patrick L. Bruno, Esq., from the Homicide Panel of the Assigned Counsel Plan.  Doc. 27 at 4.  At that suppression hearing, the prosecution called DePaolis as a witness.  H. 147.

In direct examination, DePaolis testified that on May 2, 2005, he traveled to North Carolina and interrogated Gray at the Wilson police department station house.  H. 166–167.  He testified that, first, he orally advised Gray of his *Miranda* warnings without using a form.  H. 167.[3]  "At that point," DePaolis continued, he and Gray "began to discuss the homicide," and during the discussions, Gray told DePaolis that "he was going to take the blame for this murder because his brother [Bazemore] had served enough time in his life."  *Id.*

The prosecution then asked DePaolis:  "Did you at some point read Mr. Gray his rights from a Wilson police department form?"  H. 167.  DePaolis answered in the affirmative; he specified that at 8:25 p.m., he read Gray his *Miranda* warnings from a North Carolina form, and that Gray indicated that he understood those rights by writing "yes" and his initials after each question on the form.  H. 168–69.

---

[3] There was no testimony elicited concerning whether Gray:  was advised of the *Miranda* warnings in their entirety; understood his rights; or agreed to waive his rights.

DePaolis testified that he did not take a statement from Gray immediately after reading him the *Miranda* rights from the North Carolina form, because he was attempting to obtain the form the NYPD uses for *Miranda* warnings instead.  H. 169.  He testified that, just prior to 9:10 p.m., he received the NYPD form by fax, and advised Gray of his *Miranda* rights for a third time—and for the second time using a written form.  H. 170.  DePaolis read Gray his rights using the NYPD form, and Gray indicated that he understood those rights by writing "yes" and his initials after each question on the form.  H. 170–71.

At that point in the suppression hearing, the prosecution introduced into evidence a three-page document, which DePaolis identified as "the second set of written *Miranda* Warnings and Roy Gray's statement, written statement."  H. 172.  DePaolis testified that he, DePaolis, wrote the statement, and that it was signed by Gray, DePaolis, and Detective Conneely.  H. 172–73.

Mr. Bruno conducted a short cross examination of DePaolis that did not touch upon DePaolis's warnings[4] or Gray's statements.  H. 176–180.

3. *Bronx Supreme Court*

On December 21, 2006, after the suppression hearing, Justice Marvin issued a written decision and order, granting Gray's motion to suppress his written statement. Doc. 26-6 at 12–13 ("Justice Marvin's Suppression Order").  In his "Findings of Fact," Justice Marvin described Gray's interrogation as follows:

> At 8:15 p.m. on May 2, 2005, Detective DePaolis spoke with Gray. Detective DePaolis first orally gave Gray his *Miranda* rights and they began to discuss the homicide.  During the discussions, Gray stated that he was going to take the blame for his brother, Bazemore.  Subsequently, Detective DePaolis read Gray his *Miranda* rights from a Wilson Police Department/Adult Rights Form.  Gray indicated that he understood the rights and wrote "yes" after each question and then initialed it.  At the bottom, Gray signed the form at 8:27 p.m. on May 2, 2005, in the presence

---

[4] In particular, DePaolis was not asked on cross-examination whether:  he had advised Gray of his *Miranda* warnings in their entirety; Gray understood his rights; or whether Gray agreed to waive his rights.

of two witnesses.  At about 9:10 p.m., Detective DePaolis received, via facsimile, the *Miranda* form from his Bronx office.  The detective read Gray his *Miranda* rights again and Gray wrote "yes" after each question with his initials.  Thereafter Gray made a 2-page, 54-line statement which was written by Detective DePaolis, and signed by Gray and Detectives DePaolis and Conneely.

Doc. 26-6 at 5–6 (internal citations omitted).  In his "Conclusions of Law," Justice Marvin stated that, "[p]rior to his written statement, Gray was questioned by Detective DePaolis without the proper administration of *Miranda* warnings."  *Id.* at 7, 12.  Specifically, although DePaolis testified that he delivered oral *Miranda* warnings, he "failed to delineate exactly which rights he gave" and he provided "no testimony" that Gray "expressly or impliedly waived his rights to remain silent or to counsel."  *Id.* at 12.  Justice Marvin continued that, "[i]t was *after* defendant Gray's [sic] spoke with the detective for a while that Detective [DePaolis] read the *Miranda* warnings from a North Carolina Police Department form and only 43 minutes later, the detective correctly advised Gray of his *Miranda* rights from a New York form."  *Id.* (emphasis in original).  Justin Marvin stated that Gray's written statement "was made immediately following his oral statement" with no "significant break" in the interrogation.  *Id.*  Therefore, Justice Marvin suppressed Gray's written statement "for the same reasons [the] Court granted defendant Bazemore's motion to suppress his written statement."  *Id.*[5]

   *4.  The Prosecution's Motion to Renew and Re-argue*

   On January 22, 2007, the prosecution moved for leave to renew and to re-argue the suppression hearing.  Doc. 26-7; *see also* Doc. 26-8.  They requested leave to renew in order to "offer evidence that would demonstrate that the written statement was not

---

[5] Bazemore's interrogation had followed a similar sequence of events:  DePaolis provided Bazemore with oral *Miranda* warnings—which the Bronx Supreme Court found were incomplete—and Bazemore initially did not waive his right to remain silent and to counsel; later, Bazemore was provided with written *Miranda* warnings, after which his written statement was taken.  *See* T. 155–56; Doc. 26-6 at 7–8.  Justice Marvin found that Bazemore's written statement was made "immediately after" he was questioned in violation of his *Miranda* rights, and that all his questioning—before and after the proper, complete set of *Miranda* warnings—was "in reality, a single continuous chain of events" without a definite "pronounced break."  Doc. 26-6 at 8 (citations omitted).  Justice Marvin therefore suppressed Bazemore's written statement.  *Id.* at 9.

obtained in violation of any rights of the defendant." Doc. 26-7 ¶ 15.  They moved to re-argue to address whether Gray "expressly or impliedly waive[d] his rights to remain silent or to counsel."  *Id.* ¶ 16.

The prosecution provided two grounds for their motion for leave to renew the hearing.  First, they argued that the issue of what *Miranda* rights were given orally to Gray was raised for the first time by the court, *sua sponte*, and thus the parties did not have an opportunity to address it and "[n]o evidence was introduced to explain what was actually said."  *Id.* ¶¶ 6–11.  Second, the prosecution asked the Court to grant the motion for leave to renew in the interest of justice, because "[w]ithout the ability to introduce this written statement by the defendant, the prosecution would have a legally insufficient case to bring the defendant to trial for his part in this murder."  *Id.* ¶¶ 12–14.  They argued that since they had not previously made any argument concerning the sufficiency of the oral *Miranda* warnings, allowing them a chance to "correct any deficiency in the record made by not flushing out this area of evidence" would not give them a "second 'bite of the apple.'"  *Id.*  ¶ 14.

As for the motion to re-argue, the prosecution similarly argued that the court alone, *sua sponte*, had raised the issue of whether Gray expressly or impliedly waived his rights to remain silent or to counsel.  *Id.* ¶ 17.  They thus requested the opportunity to "more fully argue this point to the court" in the interest of justice; they previewed their substantive arguments, which included that Gray's statement that he would take the blame for the crime "show[ed] an understanding of the consequences of waiving his rights," and that Gray's eight prior arrests were indicative of his familiarity with the criminal justice system.  *Id.* ¶¶ 17, 21.

In a pretrial conference held on February 26, 2007, Gray argued, in part, that if the hearing was reopened, DePaolis would "sit on the witness stand like a marionette and reel off a perfect recitation of the *Miranda* warnings," effectively tailoring the evidence to fit the court's requirements, whether unconsciously or otherwise.  H. 336.

Justice Marvin denied the prosecution's motion to renew and re-argue, reasoning that "new facts proffered by them would not have changed the prior determination," because their submission indicated that DePaolis failed to inform Gray that he was entitled to appointment of counsel, as required by *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).  Doc. 26-8 at 2.  Further, Justice Marvin stated, the prosecution's submission provided no basis for a finding that Gray waived his rights.  *Id.* at 3.

###### 5.  *The First Department's Reversal on Suppression*

In April 2007, the prosecution appealed both the suppression of the written statement and the denial of their motion to renew and re-argue the suppression hearing to the First Department.  Doc. 26-9.

On February 26, 2008, the First Department reversed Justice Marvin's Suppression Order, denied Gray's motion to suppress the written statement, and remanded for further proceedings.  *People v. Gray*, 51 A.D.3d 63, 67 (1st Dep't 2008), *leave to appeal denied*, 10 N.Y.3d 863 (2008), *cert. denied*, 555 U.S. 1182 (2009) (Doc. 12-12).

Based on the record developed up to that point, the First Department made certain factual findings that were later disproven by DePaolis' trial testimony.  For example, the First Department considered that it was only after DePaolis administered the third set of *Miranda* rights, using the NYPD form, that "defendant for the first time admitted being personally involved in the murder."  *Id.* at 65.  Additionally, it stated that "defendant's written statement admitting his personal involvement in th[e] shooting was procured some 45 minutes after he initially offered to take the blame for the crime to spare his brother more time in prison."  *Id.* at 66.  In fact, as discussed above, Gray admitted his involvement in the shooting immediately after being given the oral warnings.  Further, the First Department stated, mistakenly as it would turn out, that "the only event between defendant's initial statement about 'tak[ing] the blame' for his brother and the formal

waiver based upon the New York City rights form was the additional full and adequate administration of rights based on the North Carolina form." *Id.* (alteration in original).

Based on these facts, the First Department found that the 45-minute break—during which the record did not suggest Gray was asked any questions about the homicide—between Gray's oral statement that he would "take the blame" and his written statement, represented a "definite pronounced break in the interrogation" and dissipated any taint that may have existed from DePaolis's first set of oral *Miranda* warnings. *Id.* at 66 (citing *People v. Paulman*, 5 N.Y.3d 122, 130–31 (2005)).[6] The First Department additionally considered two circumstances as suggestive that Gray spoke to the police of his own volition:  first, that the context of Gray's initial statement about taking the blame—which the First Department characterized as ambiguous and not necessarily inculpatory—suggested that Gray was "willing, if not eager" to discuss the shooting with the police; and second, that Gray's 10-year criminal record of at least eight arrests indicated Gray chose to speak to the police "only after . . . a calculated and voluntary waiver of all of his constitutional rights." *Id.*  Therefore, the First Department found the written statement was sufficiently attenuated from any improperly obtained oral statement.

### C.  Trial

Gray's trial began on September 25, 2008, before Justice Peter Benitez in Bronx Supreme Court.  T. 1.  Ms. Samuels, K.S., Detective DePaolis, and other witnesses, testified.  T. 43, 88, 224.  Rebecca Mikulasovich, a Criminalist from the Office of the Chief Medical Examiner, testified that Gray's DNA was found on a baseball cap that had

---

[6] The First Department acknowledged, in a footnote, that "[w]hat was actually said by DePaolis—and defendant's responses—was not developed at the hearing held on defendant's motion to suppress." *Id.* at 64.

been found at the scene,[7] whereas neither Bazemore's nor the victim's DNA contributed to the material on the cap.  T. 491, 499, 505; *see also* T. 152–53.

DePaolis testified, in further detail than he had in the suppression hearing, about the sequence of *Miranda* warnings and statements from Gray's May 2, 2005 interrogation.  Consistent with the testimony he had presented at the suppression hearing, DePaolis testified that upon meeting Gray at the Wilson, North Carolina, police station, he first introduced himself and orally gave Gray his first set of *Miranda* warnings.  T. 243.  After those oral *Miranda* warnings, DePaolis continued, he and Gray began to discuss the "incident surrounding this case."  T. 244.

However, unlike in the pretrial hearing, DePaolis specified that he first met Gray at approximately 7 p.m.; he also elaborated that, in discussing the incident, Gray told DePaolis that Darren had told him Lindsay was upset, that Gray, Bazemore, and Darren took a cab to Lindsay's house, that Lindsay pointed out a house where she said the man that raped her lived, that they went to that house, Lindsay pointed out the male, and Gray shot him.  *Id.*

At that point during the direct examination, the prosecutor said, "let me back you up for a second," and he asked whether Gray said anything to DePaolis after he first introduced himself and delivered the oral *Miranda* warnings.  *Id.*  DePaolis answered in the negative.  *Id.*

The prosecutor then asked, "Well, what's the -- you began discussing the case and what happened after that?"  T. 245.  DePaolis answered that, *before* going into the "full story . . .  regarding the incident," Gray "put his hands on his chest and said to [DePaolis] that he was going to take the blame for this murder cause his brother had served enough

---

[7] The DNA results were obtained after the First Department's February 2008 reversal on suppression, and before trial, because DePaolis obtained Gray's buccal sample—which was then compared to the DNA mixture recovered from the hat—in May 2008.  *See* Doc. 27 at 46 n.23; *see also* T. 315–16.

time." *Id.*  The prosecutor asked DePaolis how long the oral conversation with Gray lasted, and DePaolis responded "for a little over an hour." *Id.*

Soon thereafter, during DePaolis' trial testimony, Mr. Bruno objected, and Justice Benitez called a recess.  T. 246.  During the recess, Justice Benitez, the prosecutor, and Mr. Bruno discussed what had taken place during the interrogation, and what the court in the pretrial suppression hearing had understood to have taken place.  The prosecutor stated that DePaolis spoke with Gray for an hour and ten minutes, then "DePaolis said he would like to put essentially the statement in writing."  T. 252.  DePaolis and Gray "both agreed to do it," then DePaolis read Gray his *Miranda* warnings at 8:25 p.m. from the North Carolina form.  *Id.*  The prosecutor continued that DePaolis decided to wait for the NYPD form, which he received at approximately 9:10 p.m.; then, DePaolis again read Gray his *Miranda* warnings, and Gray "acknowledge[d] them and then at 9:30 they commence[d] doing the written statement." *Id.*

Mr. Bruno explained why he had objected to DePaolis' testimony.  He stated that in the suppression hearing, DePaolis had testified that during the discussion about the homicide, Gray had said he would take the blame for the murder, but that was "the entire substance of the so-called oral, improper statement."  T. 254–55.  In other words, Mr. Bruno explained, "at the [pretrial] hearing no statement [was] fleshed out," because after testifying about Gray's statement that he would take the blame, DePaolis went on to discuss the *Miranda* warnings administered with the North Carolina form.  T. 255.  Therefore, Mr. Bruno explained, while he "purposely allowed" DePaolis to "quote unquote improperly testify" to Gray's chest-pounding and his statement that he would "take the blame," he could not permit DePaolis "to go any further since [Mr. Bruno] ha[d] no notice as to what the verbal or oral statement would have been."  T. 256.

Justice Benitez remarked that in reversing the lower court's suppression determination, the First Department referred to Gray's oral statement as "taking the blame for his brother," and they stated that "the only event between the defendant's initial

statement about taking the blame for his brother and the formal waiver based upon the New York City rights form was the additional full and adequate administration of rights based upon the North Carolina form." T. 258. In other words, Justice Benitez stated, "the [First Department] did not view that there had been an hour and ten minutes of conversation," and, in determining that there was attenuation between the pre- and post-written *Miranda* statements, the First Department had relied in part on its characterization of the taking-the-blame statement as a "brief statement" that was ambiguous and not necessarily inculpatory. T. 258, 259.

However, the parties agreed that the trial could continue, subject to the following: DePaolis' testimony would start again from the beginning, with Gray's initial statement that he would take the blame; then, DePaolis could testify that there was "some further conversation for an hour," but not testify as to the substance of the conversation; finally, DePaolis could testify about the formal giving of *Miranda* rights and what followed thereafter. T. 268–69. That is, Mr. Bruno agreed to DePaolis' testimony so long as the "[prosecution] [did] not go back over it and [did] not have Detective DePaolis testify that during that hour Mr. Gray went into details[.]" T. 270.

The trial resumed, and DePaolis' testimony proceeded in accordance with the agreement the parties had come to during the recess with Justice Benitez. *See* T. 274–85.

The jury found Gray guilty of murder in the second degree and acquitted him of murder in the first degree. T. 729. Justice Benitez sentenced Gray to an indeterminate term of twenty-five years to life. S. 8.

### D. Post-Trial Motions

#### 1. Motion to Vacate and Mr. Bruno's Affidavit

After trial, in July 2010, Gray moved *pro se* to vacate his conviction pursuant to C.P.L. § 440.10, on grounds that he was denied effective assistance of counsel and a fair trial. Doc. 26-12 at 2. Gray argued, in part, that Mr. Bruno's failure to move to reopen the suppression hearing after DePaolis' testimony revealed "newly discovered facts

13

elicited for the very first time at the trial . . . that directly contradicted the testimony given at the pretrial *Huntley* hearing," constituted ineffective assistance of counsel. *Id.* ¶ 58.

In their opposition to the motion to vacate, the prosecution included an affidavit submitted by Mr. Bruno, the defense lawyer, in which he described his representation of Gray from suppression hearing through sentencing. *See* Doc. 26-13 at ECF 37–44. In explaining his trial strategy, Mr. Bruno stated that, because he knew the prosecution would introduce Gray's inculpatory written statement at trial, he sought to undermine its veracity by arguing that Gray's sole reason for speaking with the police in the first place was his desire to exculpate his half-brother, Bazemore, and that the written statement was made in accordance with that aim. Doc. 26-13 at ¶ 14.

Mr. Bruno explained that he further sought to undermine the reliability of the written statement by arguing that DePaolis transcribed it himself in order to embellish and distort the facts, and that Gray hastily signed it under pressure. *Id.* ¶¶ 15, 17. Additionally, Mr. Bruno noted that, whereas he purposefully made the jury aware of Gray's initial statement about taking the blame, he "successfully fought to keep out other oral statements" made in the interrogation. *Id.* ¶ 16.

Mr. Bruno's affidavit also explained other aspects of his trial strategy, such as his argument to the jury that, even if they were to believe that Gray shot the victim with his .38 caliber gun, the evidence indicated that it was a 9mm firearm that delivered the fatal shot, and therefore Gray could not be guilty of first-degree murder. *Id.* ¶ 15. In the affidavit, Mr. Bruno remarked that indeed, the jury acquitted Gray of first-degree murder, the top count on the indictment. *Id.*

### 2. *Bronx Supreme Court*

On June 27, 2011, Justice Benitez of the Bronx Supreme Court issued a Decision and Order denying Gray's motion to vacate, in part based on a finding that Gray's claim of ineffective assistance of counsel was both procedurally barred and without merit. Doc. 26-14 at 3, 5–6.

### 3. The First Department

In May 2013, with new counsel, Sara Gurwitch, Esq., Gray filed a consolidated appeal of his conviction and Justice Benitez's June 27, 2011 order denying his motion to vacate, to the First Department. Doc. 26-16 at v. As to the ineffective assistance of counsel claim, Gray argued that Mr. Bruno's failure to move to reopen the suppression hearing, after DePaolis testified at trial, constituted a violation of his Sixth Amendment right to counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.* at 19–24. He argued that, had Mr. Bruno moved to reopen the suppression hearing, the outcome of this case would have been different; Gray explained that the First Department's earlier finding of attenuation and reversal of suppression was based on two "facts" that were disproven at trial: (1) that Gray's oral statement was non-inculpatory, and (2) that the only thing separating the "very short, non-inculpatory oral statement" from the inculpatory written statement was the proper administration of *Miranda* warnings. *Id.* at 21–22.

On April 8, 2014, the First Department affirmed Gray's conviction, finding that he was not deprived of effective assistance of counsel based on counsel's failure to move to reopen the suppression hearing, because Gray did not establish "a reasonable probability that the new evidence elicited at trial would have resulted in suppression of his written confession." *People v. Gray*, 116 A.D.3d 480, 481 (1st Dep't 2014).

The First Department relied on the prejudice prong in *Strickland*, which examines whether a defendant was prejudiced by counsel's alleged deficiencies. *Strickland*, 466 U.S. at 687. It reasoned that, "even accepting defendant's argument that no plausible strategy could justify counsel's failure to seek a reopened suppression hearing," Gray had at most a stronger argument—not a "winning" argument—that his written statement was not attenuated. *Gray*, 116 A.D.3d at 480, 481. The First Department's reasoning was based on many of the considerations it had referred to when, before trial, it reversed the Supreme Court's decision suppressing Gray's statement: (1) Gray's oral statement that he would take the blame "evinced an independent willingness to speak to police"; (2) Gray

15

received two valid sets of *Miranda* warnings, with a 45-minute gap between them during which he was not questioned; (3) Gray's extensive criminal record, with more than eight arrests, supports the conclusion that, before making his written statement, Gray was "returned, in effect, to the status of one who is not under the influence of questioning"; and, (4) Gray's oral statement was not preceded by a complete absence of *Miranda* warnings, but rather by incomplete oral *Miranda* warnings that "apparently . . . omitted the warning about appointment of free counsel." *Id.* at 481 (citing *Paulman*, 5 N.Y.3d at 131; quoting *People v. Chapple*, 38 N.Y.2d 112, 115 (1975)).

### 4. *The Court of Appeals*

In February 2015, Gray filed an appeal to the New York Court of Appeals. Doc. 26-19. On March 31, 2016, the court issued a 5-2 opinion affirming Gray's conviction. *People v. Gray*, 27 N.Y.3d 78 (2016). Writing for the majority, Judge Sheila Abdus-Salaam found that Mr. Bruno was not ineffective for failing to seek to reopen the suppression hearing following DePaolis' trial testimony. *Id.* at 82. The court reasoned that Mr. Bruno reasonably thought that the written statement would be admitted into evidence notwithstanding any new developments, because the First Department, in reversing on suppression before trial, had "cited a number of factors that remained extant throughout the proceedings in this case." *Id.* Therefore, instead of making a "longshot" motion to reopen the suppression hearing, Mr. Bruno used the exculpatory portion of Gray's oral statement to "undermine the credibility" of the written statement and "place it in context." *Id.*

The court further opined that, as a threshold matter, even had Mr. Bruno moved to reopen the suppression hearing, the trial court would not have necessarily exercised its discretion to reopen it under C.P.L. § 710.40(4). [8] *Id.* at 82–83. The Court of Appeals

---

[8] Under C.P.L. § 710.40(4), a trial court has the discretion to permit a defendant to renew a motion to suppress if the defendant shows "that additional pertinent facts have been discovered by the defendant which he could not have discovered with reasonable diligence before the determination of the motion."

pointed to Mr. Bruno's acknowledgement during trial that he was aware DePaolis "spoke at some length" with Gray before the written *Miranda* warnings; it thus concluded that, "the detective's trial testimony about the entire conversation between him and defendant prior to those warnings may not have disclosed previously undiscovered or undiscoverable facts warranting a reopened hearing." *Id.* at 83.

Moreover, had a reopened hearing taken place, the court opined it was "highly unlikely" that the written statement would have been suppressed, based on the totality of the circumstances of the interrogation, including that: DePaolis administered some form of *Miranda* warnings at the outset; there was a 45-minute break between the oral and written statements, with *Miranda* warnings issued before and after; and both Gray's "mixed inculpatory and exculpatory" statements as well as his "prior experience speaking to the police" suggested he acted voluntarily. *Id.*

Finally, the court noted that, at a reopened hearing, DePaolis could have "strengthen[ed] his account of the interrogation and the voluntariness of defendant's statements," potentially weakening Mr. Bruno's strategy of attacking the credibility of the written statement. *Id.* at 84. Therefore, the court determined that Mr. Bruno pursued a reasonable trial strategy. *Id.*

Judge Leslie E. Stein authored the dissent, arguing that Mr. Bruno's failure to move to reopen the suppression hearing deprived Gray of review of a "close suppression argument" that, if successful, could have been dispositive of the entire proceeding, and, to the extent that Mr. Bruno's failure to move to reopen the hearing was based on a strategy, it was unreasonable. *Id.* at 87 (Stein, J., dissenting). The dissenters reasoned that the new testimony from DePaolis at trial "arguably defeat[ed]" the First Department's basis for finding attenuation in its pretrial opinion reversing suppression, because it had relied on

---

C.P.L. § 710.40(4). The motion may be made before or during trial. *Id.* The additional facts need not be "outcome-determinative" or "essential," but should be such that "would materially . . . have affected the earlier [suppression] determination." *People v. Clark*, 88 N.Y.2d 552, 555–556 (1996).

an understanding that Gray admitted his involvement in the murder only *after* being given proper *Miranda* warnings, and that no questioning—much less an hourlong interrogation—occurred between the "taking the blame" statement and the written statement. *Id.* at 85–86.

The dissenters noted that, in addition to DePaolis testifying to new facts, the prosecution conceded that the written statement merely memorialized the oral statement that followed the oral warning, of which the First Department had no knowledge. *Id.* at 88. Further, they stated that, although Mr. Bruno's affidavit—which the prosecution proffered in opposing Gray's post-trial motion to vacate—discussed his general trial strategy, it did not explain why he failed to move to reopen the suppression hearing following DePaolis' trial testimony. *Id.* at 86. The dissent concluded that, rather than a "longshot," Gray would have been entitled to a reopening of the suppression hearing, and that Gray "had nothing to lose and everything to gain" from counsel making that motion.[9] *Id.* at 88, 90.

### E.  The Instant *Habeas Corpus* Petition

On April 14, 2017, Gray filed the instant petition for *habeas corpus*, *pro se*. Doc. 1. After Judge James C. Francis granted Gray's motion for appointment of counsel and for leave to amend the petition, Doc. 11, Gray filed an amended petition on June 30, 2017. Am. Pet.

Graham filed the State Court Transcript on August 28, 2017, Doc. 25, and an Opposition on August 30, 2017, Doc. 27. Gray filed a reply on September 15, 2017. Doc. 29. The case was referred to Judge Francis for a Report and Recommendation, Doc. 5, then redesignated to Judge Wang on March 5, 2018.

---

[9] The dissent additionally stated that a reopened hearing would have been unlikely to reveal that the initial warnings were in fact adequate, because even as described in the prosecution's motion to renew and re-argue, the warnings were deficient. *Id.* at 88. Further, it remarked that the importance of suppressing the written statement was heightened by the time of trial, because the prosecution had discovered that a hat found at the scene contained Gray's DNA, but not Bazemore's DNA, thereby weakening the defense's argument that Gray was merely taking the blame for Bazemore's actions. *Id.* at 91.

On July 28, 2023, Judge Wang issued an R&R recommending that Gray's habeas petition be denied, on the ground that the New York Court of Appeals did not unreasonably apply *Strickland v. Washington* in finding that Gray was not denied effective assistance of counsel. Doc. 35. Judge Wang additionally recommends that Gray be denied a certificate of appealability "because he has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2)." *Id.* at 2.

Graham filed a response to the R&R on August 11, 2023, stating that he agrees with Judge Wang's conclusions. Doc. 39. On September 8, 2023, Gray filed objections to the R&R. Doc. 40.

## II.    LEGAL STANDARDS

### A.    AEDPA Review of the State Court Proceedings

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, habeas petitions under 28 U.S.C. § 2254 may not be granted unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). This deference is required under the AEDPA if the petitioner's claim was "adjudicated on the merits in State court proceedings," as here. 28 U.S.C. § 2254(d); *see Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015).

"Th[e] statutory phrase ['clearly established Federal law, as determined by the Supreme Court of the United States,'] refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 365, 412 (2000). To show that a state court decision involved an "unreasonable application" of federal law, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that

there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Carmichael v. Chappius*, 848 F.3d 536, 544 (2d Cir. 2017) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). The Supreme Court has explained that "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The Supreme Court has also stated that the "AEDPA's standard is intentionally 'difficult to meet.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (citation omitted). In accordance with principles of federalism and comity, federal habeas review provides a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* (quoting *Richter*, 562 U.S. at 102–103); *see also Richter*, 562 U.S. at 102 ("As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings.").

In the case of ineffective assistance of counsel claims, AEDPA review is "doubly deferential," affording "both the state court and the defense attorney the benefit of the doubt." *Id.* at 316–17 (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)). Where a petitioner challenges his convictions on the basis of ineffective assistance of counsel, the district court assesses whether the state court unreasonably applied *Strickland v. Washington*. *See Williams*, 529 U.S. at 390. The question "'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citation omitted). Because *Strickland* provides a general standard, "the range of reasonable applications is substantial." *Richter*, 562 U.S. at 105 (citing *Knowles*, 556 U.S. at 123).

## B. Review of the Magistrate Judge's Report

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Parties may raise specific written objections to the report and recommendation "[w]ithin fourteen days after being served with a copy." *Id.*; *see also* Fed. R. Civ. P. 72(b)(2). A district court reviews *de novo* those portions of the report and recommendation to which timely and specific objections are made. 28 U.S.C. § 636(b)(1); *see also United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). The district court may adopt those parts of the report and recommendation to which no party has timely objected, provided no clear error is apparent from the face of the record. *Lewis v. Zon*, 573 F. Supp. 2d 804, 811 (S.D.N.Y. 2008).

Here, Gray objects to the R&R in its entirety, and therefore this Court conducts a *de novo* review of the application for *habeas corpus*.

## III.   DISCUSSION

Gray objects to the R&R on grounds that it (1) relies on an incomplete framing of the facts underlying Gray's claim, (2) erroneously concluded that "there was no possibility for fairminded disagreement" as to whether the New York Court of Appeals correctly found counsel acted reasonably in forgoing a motion to reopen the suppression motion; and (3) erroneously found that a fairminded jurist could conclude the written statement was unlikely to have been suppressed had counsel made the motion. Doc. 40 at 1. Gray additionally argues that "the R&R does not address [Gray's] meritorious arguments that the state court misapplied *Wong Sun v. United States*, 371 U.S. 471 (1963), and *Missouri v. Seibert*, 542 U.S. 600 (2004)[,]" *id.* at 2, which evaluated the admissibility of statements in the Fourth and Fifth Amendment contexts, respectively.

For the reasons stated below, the Court adopts each of the recommendations set out in the R&R and denies Gray's petition in its entirety.

### A. *Strickland* Standard

"A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings, which include entry of a plea of guilty, and sentencing[.]"  *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (internal citations omitted).  To succeed on a claim of ineffective assistance of counsel, a claimant must satisfy the two-part test established by the Supreme Court in *Strickland v. Washington*:

> Under *Strickland*, in order to prevail on an ineffective-assistance-of-counsel claim, a defendant must meet a two-pronged test:  (1) he "must show that counsel's performance was deficient," so deficient that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," and (2) he must show "that the deficient performance prejudiced the defense," in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (quoting *Strickland*, 466 U.S. at 687, 690, 694); *see also Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

Under the first prong of *Strickland*, the Court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Strickland*, 466 U.S. at 690.  The Court "must make 'every . . . effort to eliminate the distorting effects of hindsight,' and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'"  *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir. 2007) (quoting *Strickland*, 466 U.S. at 689); *see also Strickland*, 466 U.S. at 690 (the convicted defendant is required to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," and the court "must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance").  "[S]trategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which

they are based." *Strickland*, 466 U.S. at 681; *see also id.* at 690-91 (with regards to the deference owed to strategic judgments based on investigations supporting the judgments, explaining that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

Under the second prong of *Strickland*, the petitioner must establish prejudice. "To establish prejudice, a petitioner 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Kovacs v. United States*, 744 F.3d 44, 51 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" however "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111–12 (citing *Strickland*, 466 U.S. at 693, 697).

As previously discussed, this Court must assess whether the state court's application of the *Strickland* standard was *unreasonable*, not whether, in this Court's opinion, defense counsel's performance fell below *Strickland*'s standard. *Richter*, 562 U.S. at 101 (explaining that if the Court engaged in the latter inquiry, "the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court"); *see also Williams*, 529 U.S. at 365 (emphasis in original) ("For present purposes, the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Under federal *habeas* review pursuant to the AEDPA, "the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

23

### B. The Court of Appeals Did Not Unreasonably Apply *Strickland*

*1. First Prong*

Reviewing this claim *de novo*, the Court agrees with Judge Wang's conclusion that the Court of Appeals did not unreasonably apply the first prong of *Strickland* in finding that counsel's actions did not fall below an objective standard of reasonableness.

The Court of Appeals found that Mr. Bruno did not deprive Gray of effective assistance of counsel in declining to move to reopen the suppression hearing after DePaolis' trial testimony, in part because, in denying the motion to suppress before trial, the First Department "cited a number of factors that remained extant throughout the proceedings in this case." *Gray*, 27 N.Y.3d at 82. In other words, although DePaolis' trial testimony disproved certain assumptions that the First Department had relied on, the Court of Appeals reasoned that "the totality of the circumstances of the interrogation," as described at trial, still supported a finding that the written statement was voluntary and attenuated from the oral statement. *Id.* at 83. Namely, it remained true that DePaolis administered some form of *Miranda* warnings at the outset of the interrogation; that there was a 45-minute break before the written statement was taken, and proper *Miranda* warnings were given before and after that break; that Gray had prior police interactions due to eight prior arrests; and that, at the interrogation, Gray provided "mixed inculpatory and exculpatory" statements. *Id.*

In light of these factors, the Court of Appeals deemed that Mr. Bruno would have had a weak case for suppression at a reopened hearing, and that he therefore "pursued a legitimate strategy" in foregoing the "longshot" motion. *Id.* at 82, 83. The Court of Appeals thus engaged in a well-reasoned assessment of whether, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Gray argues that Mr. Bruno's decision to forgo a motion to reopen the suppression hearing was not actually based in strategy, as evidenced by the fact that his affirmation

"never once mentions or explains [his] decision not to move to reopen the suppression hearing." Doc. 29 at 7. Instead, Gray argues, Mr. Bruno never deviated from his original trial strategy of undermining the reliability of the written statement, "despite a clear opportunity (and obligation to his client)" to revise that strategy following DePaolis' trial testimony. Doc. 40 at 6.

However, it is clear from the record that, during the recess discussion with Justice Benitez and opposing counsel, Mr. Bruno did consider how to proceed in light of DePaolis' new testimony. He explained that, while he purposefully allowed DePaolis to testify about the taking-the-blame statement, he objected to additional, previously undisclosed testimony about the rest of Gray's oral statement. Therefore, Mr. Bruno made a calculated decision, opting for the trial to proceed so long as the prosecution did not elicit further testimony about the substance of the extended oral statement. *Cf. Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (holding counsel was ineffective for failing to timely move to suppress evidence, given his failure was "not due to strategic considerations" but rather to his complete failure to conduct any pretrial discovery, such that he was not even aware of the evidence the government planned to present at trial).

Therefore, the Court of Appeals' finding that Mr. Bruno "pursued a legitimate strategy" as part of his decision not to move to reopen the suppression hearing is not rendered unreasonable by the fact that Mr. Bruno did not explicitly articulate in his affidavit a strategic rationale for not making the motion. *Gray*, 27 N.Y.3d at 83; *see Englert v. Lowerre*, 115 F.4th 69, 81 (2d Cir. 2024) (citations omitted) (a petitioner "bears a heavy burden" to overcome *Strickland*'s strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment"); *see also Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690) ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."). Moreover, Mr. Bruno's affidavit, which discusses several aspects of

his representation of Gray, on balance, suggests that Mr. Bruno provided an overall effective representation of Gray, which itself weighs against a finding of ineffective assistance of counsel. *See Strickland*, 466 U.S. 688 ("[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (an "isolated error of counsel" can amount to a violation of effective assistance of counsel "if that error is sufficiently egregious and prejudicial").

Gray additionally objects to Judge Wang's remark that "[a] fairminded jurist could conclude, and *indeed five jurists on the Court of Appeals did conclude* that [counsel's] trial strategy was reasonable." Doc. 40 at 9–10 (quoting R&R at 15) (emphasis added). Gray remarks that, "if a state court jurist's view that a trial strategy was reasonable effectively foreclosed a later writ of habeas challenging that same trial strategy, there would be no effective habeas review at all." *Id.* at 10. But neither the R&R nor this Court rely on the mere fact that some state jurists subjectively found Mr. Bruno's strategy to be reasonable. Rather, for the reasons discussed above, the Court of Appeals' majority did not make an *objectively unreasonable* determination that Mr. Bruno's performance was above the constitutional minimum for competency. *Williams*, 529 U.S. at 409 ("Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."); *see also Richter*, 562 U.S. at 105 ("The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.").

Finally, Gray argues that, "where, as here, counsel fails to take an act that could have case-dispositive benefit, he does not meet the minimum, objective standard of reasonableness under *Strickland*." Doc. 40 at 11. However, the cases Gray cites do not stand for such broad proposition. *See Morrison*, 477 U.S. at 384; *Owens v. United States*, 387 F.3d 607, 610 (7th Cir. 2004); *Rodriguez v. Young*, 906 F.2d 1153, 1160 (7th Cir.

1990).  Moreover, the assessment of how much counsel's actions or omissions affect the case's outcome is better suited for the second prong of the *Strickland* inquiry, which asks whether there is a "reasonable probability" that the outcome of the case would have been different but-for counsel's purported error.  *See Kovacs*, 744 F.3d at 51.

In sum, this Court finds that the Court of Appeals reasonably applied *Strickland*'s first prong.

### 2.  *Second Prong*

The Court additionally agrees with Judge Wang's conclusion that the Court of Appeals did not unreasonably apply the second prong of *Strickland* in finding that counsel's actions did not prejudice Gray.

In the Court of Appeals' judgment, there was only a "highly remote possibility" that counsel could have convinced the trial court to reopen the suppression hearing in the first place, let alone to grant suppression of the written statement.  *Gray*, 27 N.Y.3d at 82. First, the Court of Appeals stated that it was "not entirely clear" the trial court would have exercised its discretion to reopen the hearing.  *Gray*, 27 N.Y.3d at 82.  Gray would have needed to show "that additional pertinent facts [were] discovered by the defendant which he could not have discovered with reasonable diligence before the determination of the motion," C.P.L. § 710.40(4); this may have been complicated by Mr. Bruno's acknowledgment during the trial recess that he was aware DePaolis "spoke at some length" with Gray before the written *Miranda* warnings.  *Gray*, 27 N.Y.3d at 83.  Second, even had the suppression hearing been reopened, the Court of Appeals opined that Gray would have had a weak case for suppression, on the merits, based on the circumstances of the interrogation that remained true post-trial.  *Id.*  The Court of Appeals called it "highly unlikely" that the trial court would have suppressed the written statement at a reopened hearing, going so far as to state that the factors that remained extant throughout the proceeding "plainly showed" that the written statement was voluntary and attenuated from the improperly *Mirandized* statements.  *Id.*  Therefore, it appears that in the Court of

Appeals' judgment, there was not a "reasonable probability" that the result of the proceeding would have been different had counsel moved to reopen the suppression hearing. *Kovacs*, 744 F.3d at 51.

Gray argues that two Supreme Court cases—*Wong Sun v. United States* and *Missouri v. Seibert*—show that the Court of Appeals' attenuation analysis involved an unreasonable application of federal law. Doc. 40 at 13–14. However, *Wong Sun* and *Seibert* are significantly distinguishable from the instant case. *Wong Sun* did not implicate the Fifth Amendment at all; in that case, the Supreme Court evaluated whether a statement was sufficiently attenuated from an unlawful entry and unlawful arrest to be admissible, pursuant to the "fruit of the poisonous tree" doctrine of the Fourth Amendment. *Wong Sun*, 371 U.S. at 485. In *Seibert*, the Court considered a specific police interrogation tactic of willfully withholding *Miranda* warnings to obtain a confession, then providing *Miranda* warnings and obtaining the same confession again. *Seibert*, 542 U.S. at 604. In the suppression hearing in that case, the officer had admitted that he "made a 'conscious decision' to withhold *Miranda* warnings," thus deploying the interrogation technique as he was taught it: "question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" *Id.* at 605–06. The Court determined that, in that scenario, the warnings cannot function "effectively," as *Miranda* requires, because the police "get a confession the suspect would not make if he understood his rights at the outset." *Id.* at 611–12, 613. The Court further explained:

> Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. . . . What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail. Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and

"depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."

*Id.* at 613–14 (alteration in original) (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986)).[10]  In this case, unlike in *Seibert*, Gray received partial *Miranda* warnings at the outset of the interrogation, and he had numerous prior encounters with the police.  The Court of Appeals reasonably relied on those facts, as well as other circumstances of the interrogation, to find that Gray's statements were voluntary and attenuated from the pre-break statements—in essence, that the written *Miranda* statements he received were able to function effectively.  *See Gray*, 27 N.Y.3d at 83 (citing, in comparison, *Seibert*, 542 U.S. at 611 and 620–22 (Kennedy, J., concurring)).

Gray additionally contests the Court of Appeals' determination that prejudice could have resulted from a motion to reopen—as opposed to from the omission of one. The Court of Appeals stated that, "had counsel sought a reopened hearing, [DePaolis] would have had the opportunity to strengthen his account of the interrogation and the voluntariness of defendant's statements," potentially weakening Mr. Bruno's efforts to attack the credibility of Gray's written statement.  *Id.* at 84.  Gray argues that, to the contrary, had DePaolis offered "*yet another* version" of his testimony at a reopened hearing, *his* credibility would have been weakened.  *Id.* at 8 (emphasis in original). Moreover, Gray claims that, even had the full oral statements been rendered admissible at a reopened hearing, Gray would not have been in a worse-off position, because "there was no greater harm . . . in having the jury learn about an inculpatory statement in oral

---

[10] Gray correctly points out that the attenuation analysis additionally depends on other factors, such as whether the warned statement is obtained in a physically and temporally distinct environment from the unwarned statement.  Indeed, the *Seibert* Court distinguished *Oregon v. Elstad*, 470 U.S. 298 (1985)—in which the Court found that an unwarned confession the suspect made in his living room did not render inadmissible the properly *Mirandized* confession later obtained at the station house—noting that the questioning at the station house presented a "markedly different experience" from the conversation at home.  *Seibert*, 542 U.S. at 615.  However, the *Seibert* Court also took care to note that, "it is fair to read *Elstad* as treating the living room conversation as a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally."  *Id.* at 615.  Therefore, the Court considered the "warn-first practice" from *Seibert* to be a uniquely manipulative one, as compared to a situation where *Miranda* warnings are omitted *in good-faith* and are "open to correction."  *Id.*

and written form" as opposed to "in written form only." Doc. 29 at 8. Therefore, Gray argues there was "nothing to lose" from moving to reopen the suppression hearing. *Id.* at 3; *see also* Doc. 40 at 11.

Gray additionally claims that, conversely, there was "everything to gain by revisiting the suppression question," Doc. 29 at 3, because, considering the prosecution's certification that they could not have proceeded without the written statement, it "cannot be seriously debated" that the "outcome of the case would have been different with a favorable suppression decision." Doc. 40 at 11. Gray recognizes that it was only after that certification that the prosecution received the DNA results of the hat found at the scene—which contained Gray's DNA, but not Bazemore's. Doc. 13 at 9 n.2; *see also* Doc. 27 at 46 n.23. However, Gray argues that DNA evidence is unreliable, Doc. 13 at 9 n.2, and that the prosecution nonetheless conceded that the DNA evidence "alone, though corroborative of the written statement, would have been insufficient standing apart from the statement to establish that [Gray] had committed the instant crime." Doc. 29 at 11 (quoting Doc. 27 at 46 n.23). Nonetheless, the prosecution argues that "[Gray's] characterizations of the evidence generated and the weight to be accorded thereto do not accurately reflect the totality of the proof by the time of trial," Doc. 27 at 53 n.24, citing, for example, to the fact that Ms. Samuels testified that she saw the gunman who fired at her. *See* Doc. 26-20 at 39.

While this Court agrees with Gray that there is some likelihood that a reopened hearing could have resulted in a different case outcome, the Court does not here determine whether that likelihood would have been "substantial, not just conceivable," as required by *Strickland. Richter*, 562 U.S. at 112. On review of a *habeas* petition, this Court can only grant relief if it determines that the state court's determination was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *id.* at 102 ("It bears repeating that even a strong case for relief does not mean the state court's

contrary conclusion was unreasonable."). Here, for the reasons previously discussed, the Court cannot say that the Court of Appeals' determination represented an "extreme malfunction" in the state criminal justice system such that "there could be no reasonable dispute that [the state court] was wrong." *Woods*, 575 U.S. at 316 (citation omitted). Rather, the Court of Appeals applied the second prong of *Strickland* properly in making its determination that the possibility was "highly remote" that the trial court would have reopened the suppression hearing, that the statement would have been suppressed, and that the case outcome would have been distinct. *Gray*, 27 N.Y.3d at 82.

In sum, the Court finds that the Court of Appeals reasonably applied *Strickland*'s second prong.

## IV.    CONCLUSION

For the reasons set forth above, the Court ADOPTS Judge Wang's Report and Recommendation. The Petition is hereby DISMISSED.

The Court further concludes that Gray has failed to make a substantial showing of the denial of a constitutional right, 28 U.S.C. § 2253(c)(2), and accordingly a certificate of appealability is DENIED.

The Clerk of Court is respectfully directed to close the case.

It is SO ORDERED.

Dated:    May 21, 2025
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.

31